

# Fourth Court of Appeals
## San Antonio, Texas

### MEMORANDUM OPINION

No. 04-14-00054-CR

Marcus Anthony **ROBINSON**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 379th Judicial District Court, Bexar County, Texas
Trial Court No. 2011CR0413
Honorable Ron Rangel, Judge Presiding

Opinion by:    Karen Angelini, Justice

Sitting:    Sandee Bryan Marion, Chief Justice
Karen Angelini, Justice
Marialyn Barnard, Justice

Delivered and Filed:  January 14, 2015

AFFIRMED

After having been found competent to stand trial, Marcus Anthony Robinson was convicted of murder. In one issue on appeal, Robinson argues the jury's competency finding was against the great weight and preponderance of the evidence. We affirm.

### DISCUSSION

Before the trial on the merits, a jury trial was held to determine whether Robinson was competent to stand trial. At the competency trial, Robinson presented testimony from three family members. The first witness was Robinson's grandmother, Melrose Goode. She testified that

Robinson had lived with her most of his life. While he was in school, he was placed in a class with slow learners. According to Melrose, in the last few months before the murder, Robinson would talk and smile to himself. Melrose testified that Robinson had become very paranoid, saying someone was after him. At one point, he left Melrose's home, saying that he was afraid to stay with her, and went to stay with his uncle. According to Melrose, during Robinson's first year of incarceration awaiting trial, Robinson would talk to her during visits. However, after the first year, Robinson stopped talking altogether and even refused to see her when she came to visit him. Melrose testified that Robinson did not appear to her to be taking care of his physical appearance or hygiene. When asked whether she thought he understands what is going on, Melrose replied, "I don't think so, but I don't know."

The second witness to testify was Robinson's uncle, Gary Goode. Gary testified that at one point, Robinson stayed with him at his house. According to Gary, Robinson was very paranoid and would take the mattresses off the bed and lie under them to protect himself. At some point, Gary sent Robinson back to live with Melrose.

The final family witness to testify was Gary's wife, Monica Coburn. According to Monica, Robinson acted paranoid when he was living with them. Monica testified that it seemed like everything scared Robinson. Robinson slept under the bed because he said he felt safer there. Monica testified that Robinson talked to himself, and his ramblings grew more intense as he got older. Monica explained that Robinson's mother is a paranoid schizophrenic. Monica testified that she began seeing the same signs in Robinson. According to Monica, while Robinson was living at her home, he began to destroy things. However, Monica admitted that while Robinson was living with at her home, she was able to have conversations with him, and he could understand what was going on around him.

The State presented one witness, Dr. Brian Skop, a forensic psychologist, who performed four competency evaluations on Robinson. The first time Dr. Skop evaluated Robinson was at the detention center on March 28, 2011. Dr. Skop testified that on that occasion, Robinson interacted normally with him. Robinson was very communicative and relayed a clear history. According to Dr. Skop, Robinson talked about his background, his thoughts were clear, and there was no indication of hallucinations. Robinson was able to communicate effectively. Dr. Skop testified that Robinson had no psychiatric history and his medical records indicated no psychological history. Dr. Skop testified that Robinson said he had not had any serious medical problems. Robinson told Dr. Skop that he had been working and had maintained a relationship. Robinson also said he had been in special education in school and had left school in the 11th grade.

According to Dr. Skop, Robinson was groomed, cooperative, maintained good eye contact, and did not have any unusual mannerisms. Robinson's speech was normal, but he reported that he was anxious and depressed about his situation. Dr. Skop testified that Robinson's thought processes and content were logical and well-connected, though Robinson's intelligence was in the low average range. Dr. Skop and Robinson discussed the case pending against Robinson, and according to Dr. Skop, Robinson exhibited a rational understanding of the proceedings against him. They also discussed legal strategies and options that would be available to Robinson. Dr. Skop testified that Robinson seemed to have a basic understanding of the concepts and was able to discuss them. Further, Robinson exhibited the capacity to behave appropriately in a court room. At that time, Dr. Skop diagnosed Robinson with "an adjustment disorder which is basically a maladaptive emotional response to stress." Dr. Skop believed he was competent to stand trial.

The second evaluation was November 6, 2012. Before Dr. Skop met with Robinson, he was told by the defense attorney that Robinson had been uncommunicative with him. When Dr. Skop went to see Robinson, Robinson refused to come to the medical department, so Dr. Skop met

with him in the jail unit. At that time, Robinson responded to Dr. Skop's voice, but did not interact. Dr. Skop testified that although Robinson was dramatically different, he did not talk to himself or appear to be responding to internal stimuli. Dr. Skop reviewed Robinson's medical records and found that he had become mute. Robinson had been seen by a couple of psychiatrists who concluded his mutism was intermittent and voluntary. There were times when Robinson spoke with individuals.

At that time, Dr. Skop spoke with one of the psychiatrists who had seen Robinson. That psychiatrist said Robinson was still able to respond to verbal instructions. Because of Robinson's behavior, the jail psychiatrists believed Robinson was malingering and was fabricating his mutism. Dr. Skop did not change his diagnosis.

Dr. Skop met with Robinson a third time on August 30, 2013. The evaluation was much the same, except Robinson did come to the medical department. Also Dr. Skop had spoken with Melrose, Robinson's grandmother. Melrose told Dr. Skop things about Robinson that were similar to her court testimony. According to Dr. Skop, on this third occasion, Robinson was better groomed, and he was interactive, looking at Dr. Skop, smiling, shaking hands, and nodding in answer to some questions. But, Robinson would still not speak. Dr. Skop learned Robinson had been involved in a fight and afterward was talking freely with officers until he was informed a social worker with Mental Health was present. Robinson then refused to answer questions. Dr. Skop testified that this event suggested Robinson's speaking was under his voluntary control. Dr. Skop testified that there were other notes in Robinson's detention center record that indicated Robinson had been involved in other incidents and had spoken. Dr. Skop's diagnosis was unchanged.

The last time Dr. Skop met with Robinson was on the day Dr. Skop testified. According to Dr. Skop, Robinson initially made eye contact but would not respond verbally to questions. Dr.

Skop testified that based on all that has occurred since his first visit with Robinson, Dr. Skop believed Robinson was competent to stand trial. Dr. Skop stated he "didn't really have a basis to conclude that there's something else going on besides that [Robinson]'s intermittently choosing to speak and not speak." Dr. Skop did testify that it is possible to have intermittent mutism without it being faked.

After hearing all the evidence, the jury found Robinson competent to stand trial. Another jury then heard evidence in the trial on the merits and found Robinson guilty of murder.

"An appellate court measures the propriety of the competency verdict based on the evidence before the jury at the time of the verdict under the relevant legal standard set out in article 46B.003(a) of the Code of Criminal Procedure." *Musgrove v. State*, 422 S.W.3d 13, 15 (Tex. App.—Waco 2013, pet. ref'd). Article 46B.003(a) of the Texas Code of Criminal Procedure provides the following:

> A person is incompetent to stand trial if the person does not have:
>
> (1) sufficient present ability to consult with the person's lawyer with a reasonable degree of rational understanding; or
> (2) a rational as well as factual understanding of the proceedings against the person.

TEX. CODE CRIM. PROC. ANN. art. 46B.003(a) (West 2006). Article 46B.003(b) further provides that "[a] defendant is presumed competent to stand trial and shall be found competent to stand trial unless proved incompetent by a preponderance of the evidence." *Id.* art. 46B.003(b).

> Evidence relevant to these issues includes whether a defendant can (1) understand the charges against him and the potential consequences of the pending criminal proceedings; (2) disclose to counsel pertinent facts, events, and states of mind; (3) engage in a reasoned choice of legal strategies and options; (4) understand the adversarial nature of criminal proceedings; (5) exhibit appropriate courtroom behavior; and (6) testify.

*Morris v. State*, 301 S.W.3d 281, 286 (Tex. Crim. App. 2009). "A defendant's competency to stand trial is a question of fact to be determined by the competency jury." *Id.* at 287. Thus, the jury had

to decide if Robinson, who was presumed to be competent, proved his incompetency by a preponderance of the evidence. *See id.* at 286-87. On appeal, we measure "the propriety of the competency verdict based on the evidence before the jury at the time of the verdict under the relevant legal standard set out in article 46B.003(a)." *Morris*, 301 S.W.3d at 291; *see also Musgrove*, 422 S.W.3d at 15 (quoting *Morris*, 301 S.W.3d at 291).

Robinson argues that he proved he was incompetent to stand trial by a preponderance of the evidence because the evidence showed his mother suffered from schizophrenia and he was showing signs of schizophrenia himself. He contends that the evidence showed he was becoming severely mentally ill, and that his mutism rendered him incompetent to stand trial because he was unable to assist in his defense.

The State, on the other hand, argues Robinson did not meet his burden because he did not prove his mutism was involuntary. In other words, according to the State, Robinson was choosing not to assist his counsel in his defense. Further, the State urges that the evidence did not show Robinson suffered from severe mental illness and, even if he did, a mental illness does not necessarily render him incompetent to stand trial. We agree with the State.

Although there was some evidence from Robinson's family members that he appeared to exhibit symptoms of schizophrenia, there was no evidence that he had ever been diagnosed with schizophrenia or any other severe mental illness. Neither the jail psychiatrists nor Dr. Skop diagnosed Robinson with schizophrenia or other severe mental illness. And, based on his personal evaluations and review of jail records, Dr. Skop was of the opinion that Robinson was competent to stand trial. Furthermore, even if the evidence did show Robinson suffered from schizophrenia or other severe mental illness, such a diagnosis does not necessarily mean he was incompetent to stand trial. *See Townsend v. State*, 949 S.W.2d 24, 27 (Tex. App.—San Antonio 1997, no writ).

Robinson also contends that the fact that he was mute rendered him incompetent to stand trial because he was unable to assist in his defense. The evidence failed to show, however, that his mutism was involuntary. Dr. Skop did testify that it is possible to have intermittent mutism without it being faked; nevertheless, the evidence demonstrated that Robinson's mutism was voluntary. The evidence showed that during Dr. Skop's first evaluation of Robinson, Robinson engaged in normal interaction, communicating effectively and relaying a clear history. Robinson was able to discuss with Dr. Skop the legal proceedings pending against him. Dr. Skop testified that at the second evaluation, although Robinson was mute, detention center records showed that, according to two jail psychiatrists, Robinson's mutism was intermittent and voluntary. Dr. Skop further testified that on the third occasion, although Robinson was still mute, he did interact by gesturing and nodding. Dr. Skop also learned that Robinson had been involved in a fight and afterward had been speaking freely until he learned a social worker was present. Further, Dr. Skop testified that there had been other reported incidents indicating Robinson had been speaking. According to Dr. Skop, on the fourth occasion, although Robinson was again mute, he did make eye contact. All of these observations led Dr. Skop to conclude that Robinson's mutism was voluntary—i.e., he was choosing not to communicate with his defense counsel to help with his defense.

Because Robinson did not meet his burden of proving by a preponderance of the evidence that he was incompetent to stand trial, we affirm the trial court's judgment.

Karen Angelini, Justice

Do not publish